IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | CRIMINAL NO.  3:12-CR-54-L |
| JACQUES ROY, ET AL. | |

### GOVERNMENT'S NOTICE OF INTENT TO OFFER EVIDENCE POTENTIALLY RELEVANT TO FEDERAL RULE OF EVIDENCE 404(b)

The government notifies the defendants that the government intends to offer evidence at trial of the following issues.[1]  Although the government believes these acts are intrinsic to the indictment, it flags these issues here should the defense wish to argue that they constitute other crimes, wrongs or acts that would be subject to Federal Rule of Evidence 404(b).

## FACTUAL BACKGROUND

In Count One of the Superseding Indictment, the government charged the remaining four defendants with a conspiracy to commit healthcare fraud, pursuant to 18 U.S.C. § 1349.  (*See* Dkt. No. 131.)  In that count, the government alleges that the defendants conspired with each and with others to defraud Medicare and Medicaid through companies that the defendants owned and/or controlled.  These companies included, among others, Medistat Group Associates, P.A. ("Medistat"), Apple of Your Eye Health Care Services, Inc. ("Apple"), and Charry Home Care Services, Inc. (Charry").

---

[1]     One issue, Number 8, has been filed under seal in an abundance of caution.

As part of the conspiracy, defendants Stiger, Veasey, Eleda, and others improperly recruited patients (beneficiaries) to sign up for home healthcare services.  Defendant Eleda and others would falsify medical documents to make it appear as though those beneficiaries qualified for home healthcare services that were not medically necessary.[2] Eleda and others then prepared Plans of Care (that is, a document which outlined the plan of treatment for that beneficiary) that were not medically necessary.  These Plans of Care, which were also known as POCs or 485s ("485" is the form number on which a Plan of Care is completed), were then delivered to Dr. Roy or another physician working under his direction.

Dr. Roy instructed his staff to certify these POCs, which indicated to Medicare and Medicaid that a doctor (typically Dr. Roy) had reviewed the treatment plan and had deemed it medically necessary.  In doing so, that doctor (typically Dr. Roy) certified that the patient required home healthcare services, which were only permitted to be provided to those individuals who were homebound and required skilled nursing, among other requirements.  As noted in the Superseding Indictment, this process was repeated for "thousands" of POCs.  (*See* Dkt. No. 131 at 12, ¶ 36.)

Nurses, who worked for Stiger, Veasey, and Eleda, among others, then falsified visit notes to make it appear as though skilled nursing services were being provided.  Dr. Roy would also visit the patients and perform unnecessary home visits and then order

---

[2]    The Superseding Indictment has been summarized for purposes of this Factual Background.  Any omissions from or differences from the Superseding Indictment should not be deemed as an acknowledgment or concession regarding any part of the alleged scheme.  Instead, this Factual Background was meant to provide a brief overview of the case.  The government stands by each of the facts alleged in the Superseding Indictment.

unnecessary medical services for the recruited beneficiaries.   Then, at Dr. Roy's instruction, Medistat employees would submit fraudulent claims to Medicare for the certifications and re-certifications of unnecessary home healthcare services, and other unnecessary medical services.

The Superseding Indictment also outlines and details the fraudulent business model utilized by Dr. Roy at Medistat.   This includes a description of the "485 Department," which effectively served as a boiler room for the affixation of fraudulent signatures and certifications.  The Superseding Indictment alleges that Dr. Roy processed and approved POCs for 11,000 unique Medicare beneficiaries from more than 500 different home health agencies.

The Superseding Indictment also discusses some of the proof that will be presented at trial, including the testimony of an individual known as J.A. and recordings he made between himself and Dr. Roy.   These conversations focus on a disagreement between Dr. Roy and J.A. regarding the origination and operation of a home health agency that Dr. Roy has asked J.A. to create.

The Superseding Indictment also alleges that Dr. Roy entered into formal and informal fraudulent arrangements with Apple, Charry, and other home health agencies to ensure that his fraudulent business worked and that he had a steady stream of Medicare beneficiaries. Details of these fraudulent arrangements are provided in the Superseding Indictment.

Finally, the Superseding Indictment also alleges that when the Centers for Medicare and Medicaid Services (CMS) suspended Dr. Roy and Medistat from further

billing in June 2011 because of suspected fraud, Dr. Roy sought an end-run around the suspension through the use of another company, Medcare HouseCalls.   Dr. Roy directed the medical providers he employed to be re-credentialed and to bill Medicare under Medcare HouseCalls, as opposed to Medistat.   Nonetheless, the money that was paid by Medicare was circumvented back to Medistat and Dr. Roy.

In Counts 2 through 11, Dr. Roy, Veasey, and Eleda are charged with individual counts of healthcare fraud, pursuant to 18 U.S.C. §§ 1347 and 2.  (*See* Dkt. No. 131.)

In Counts 12 through 14, Eleda is charged with making False Statements for Use in Determining Rights for Benefits and Payments by Medicare, pursuant to 42 U.S.C. § 1320a-7b(a)(2).  (*See* Dkt. No. 131.)  These counts relate to submissions made by Eleda regarding care she allegedly provided even though she was not even present in the country at the time of the alleged care.

In Counts 15 and 16, Dr. Roy is charged with making False Statements Relating to Healthcare Matters, pursuant to 18 U.S.C. § 1035.  (*See* Dkt. No. 131.)  These charges relate to the Medcare HouseCalls cover-up and the fact that these claims indicated that they were unassociated with Medistat, when in fact, they were Medistat patients.

Finally, Count 17 alleges that Dr. Roy obstructed justice, under 18 U.S.C. § 1505, when he directed Medistat employees to bill Medicare for home visits under the Medcare HouseCalls provider number so that he could continue to receive Medicare funds, even though he had been suspended by CMS.

# RELEVANT LAW

Federal Rule of Evidence 404(b) provides that evidence "of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," although such evidence may be admissible "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(1)-(2).   *See also United States v. Smith*, 2015 U.S. App. LEXIS 18552, 21-22 (5th Cir. Oct. 23, 2015)

At the threshold, however, evidence of an uncharged crime or "other act" must be sufficient to support a finding that the crime or act actually occurred.  *United States v. Gutierrez-Mendez*, 752 F.3d 418, 423-24 (5th Cir. 2014) (citing Fed. R. Evid. 104(b)).

If evidence of the crime or act is sufficient, its admissibility under Rule 404(b) hinges on whether (1) it is relevant to an issue other than the defendant's character, and (2) it "possess[es] probative value that is not substantially outweighed by its undue prejudice" under Federal Rule of Evidence 403.  *United States v. Beechum*, 582 F.2d 898, 911 (5th Cir. 1978).

Notably, courts have been more willing to allow the admission of extrinsic evidence in cases involving a conspiracy charge in order to prove the intent element of the charged crime.  *See United States v. Parziale*, 947 F.2d 123, 129 (5th Cir.1991) ("[t]he mere entry of a not guilty plea in a conspiracy case raises the issue of intent sufficiently to justify the admissibility of extrinsic offense evidence." cert. denied, 503

U.S. 946, 112 S.Ct. 1499 (1992); *see also United States v. Prati*, 861 F.2d 82, 86 (5th Cir.

1988) (same); *United States v. Gordon*, 780 F.2d 1165, 1174 (5th Cir. 1986) (same).

In performing the second part of the *Beechum* test, "the task for the court ... calls

for a commonsense assessment of all the circumstances surrounding the extrinsic

offense." *United States v. Richards*, 204 F.3d 177, 200 (5th Cir. 2000). Several factors

affect the probative value of the evidence, including "the extent to which the defendant's

unlawful intent is established by other evidence, the overall similarity of the extrinsic and

charged offenses, and the amount of time that separates the extrinsic and charged

offenses." *United States v. Chavez*, 119 F.3d 342, 346–47 (5th Cir. 1997).

Additionally, the risk of unfair prejudice is substantially lowered by a district

court"s limiting instruction. *United States v. Crawley*, 533 F.3d 349, 355 (5th Cir.2008).

## EVIDENCE AT ISSUE

***Issue No. 1: Texas Medical Board Records*** – The government intends to

introduce evidence related to Dr. Roy's activities in destroying and falsifying records

related to a former patient, known here as E.R., and Dr. Roy's submission of these

falsified records to the Texas Medical Board. These activities are discussed in detail in

the Factual Resume for Teri Sivils submitted and accepted by the Court as a factual basis

for Sivils' guilty plea to Count One of the Superseding Indictment. (*See* Dkt. No. 514,

paragraph 6 of the Stipulated Facts.)

As discussed in that document and as the government anticipates will be elicited

from witness and co-defendant Teri Sivils, Dr. Roy provided home visits to E.R. in 2006.

E.R. was a Medicare beneficiary. Following E.R.'s death, E.R.'s family filed a complaint

with the Texas Medical Board on or about January 18, 2008.  As a result, the Texas Medical Board requested documentation from Dr. Roy.  After receiving the request, Dr. Roy contacted Sivils and instructed her to pull E.R.'s medical records.  Once the medical records were obtained, Dr. Roy instructed Sivils to remove specific original medical documents from E.R.'s file and to destroy them by shredding the documents.  After receiving that direction from Dr. Roy, Sivils noticed that Dr. Roy had drafted new medical records and that Dr. Roy had placed a new draft in the medical records file.

Dr. Roy instructed Sivils to send these newly created records to Dr. Roy's attorney, who subsequently forwarded those documents to the Texas Medical Board on March 3, 2008.  Sivils followed Roy's instructions with regards to removing the documents from E.R.'s records, but Sivils did not destroy the records; instead, she kept and maintained the documents.  Sivils has admitted that she knowingly assisted Dr. Roy in altering the records that were submitted to the Texas Medical Board in response to the formal complaint.

The evidence discussed above is "inextricably intertwined" with the conspiracy charged in Count One of the Indictment and is thus admissible under Federal Rule of Evidence 402.  This is true for a variety of reasons.

Dr. Roy's submission of false and fraudulent documents to the Texas Medical Board was performed in an attempt to maintain his license with the Texas Medical Board. The evidence suggests that Dr. Roy was so concerned about information related to E.R., that he was willing to take the extraordinary step of destroying medical documentation and submitting falsified medical documentation in place of the destroyed material.  As

Dr. Roy knew, if the Texas Medical Board had suspended, revoked, or taken other adverse action against Dr. Roy in 2006, because of any information related to E.R. and/or Dr. Roy's treatment of E.R., Dr. Roy would have been unable to continue to effectuate the conspiracy. More succinctly, if Dr. Roy was suspended by the Texas Medical Board, he could not continue to improperly bill Medicare and Medicaid. In effect, his license was a key that unlocked the door to the fraudulent scheme.

There is no question that Dr. Roy's actions were temporally connected to the conspiracy. According to Sivils, the evidence related to his attempt to falsify records took place in 2006, in the midst of the charged conspiracy. As alleged in paragraph 19 of the Superseding Indictment, the conspiracy took place between November 2004 and February 2012.

In addition, as discussed above, these facts are detailed in the Factual Resume of Sivils, and which was already accepted by this Court as a factual basis for Sivils' guilty plea to the exact same charge (conspiracy to commit healthcare fraud) that the government has charged the other defendants with in Count One. The government anticipates introducing the facts discussed in Factual Resume as evidence given their clear relevance to Sivils' anticipated testimony and anticipates that Sivils' plea deal with the government (which necessarily includes the Factual Resume) will be a significant topic raised by the defense during the cross-examination of Sivils. As such, the facts set forth in the Factual Resume are inextricably intertwined.

Even if the Court somehow determined that this evidence was not inextricably intertwined with the charged offenses, it would still be admissible under Fed. R. Evid.

404(b), which provides that "evidence of other crimes, wrongs, or acts" may "be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

The evidence of Dr. Roy's attempted destruction and falsification of medical records related to E.R. is proof of Dr Roy's intent, and absence of mistake or accident in falsifying other medical documentation – including the thousands of POCs that were falsified by Dr. Roy's staff, at Dr. Roy's instruction.  On each POC that Dr. Roy signed, he was required to attest that he had certified "that this patient is confined to his/her home and needs intermittent skilled nursing care" and "[t]he patient is under my care, and I have authorized services on this plan of care and will periodically review the plan."

The government anticipates that the evidence will show that Dr. Roy's signature was affixed to these POC's on hundreds, if not thousands of occasions, even though he never reviewed the POC and the patient did not need skilled nursing or was not homebound.  Moreover, the POC's routinely contained diagnoses or treatment plans that were not based in fact, and were listed solely to maximize the billing and payments from Medicare.   Thus, the government anticipates that the evidence will show that the POC's were falsified, just like the documents that Dr. Roy submitted to the Texas Medical Board.

As Courts have routinely stated, Rule 404(b) is a "rule of inclusion rather than exclusion." *United States v. Cruz*, 326 F.3d 392, 395 (3d Cir. 2003).  *See also United States v. Andersen*, 374 F.3d 281, 288 (5th Cir. Tex. 2004) ("Rule 404(b) is a rule of inclusion").  In other words, a court may admit prior crimes or bad acts evidence "if

relevant for any other purpose than to show a mere propensity or disposition on the part of the defendant to commit the crime." *United States v. Johnson*, 199 F.3d 123, 128 (3d Cir. 1999) (quoting *United States v. Long*, 574 F.2d 761, 766 (3d Cir. 1978)). That is the case with this evidence and it should be admitted.

As noted above, when the government must prove intent in a case involving a conspiracy charge, the Fifth Circuit has routinely upheld the admission of extrinsic evidence for this purpose. *See Parziale*, 947 F.2d at 129 (5th Cir.1991); *Prati*, 861 F.2d at 86; *Gordon*, 780 F.2d at 1174.

*Issue No. 2:  Frisking of Ernest Amadi* – The government intends to call Ernest Amadi as a witness in the government's case-in-chief and elicit information from him regarding an encounter between Amadi and Dr. Roy in November 2010.

Amadi was part owner, Chief Executive Officer, and the administrator for Alliance Healthcare Services, L.P. ("Alliance"), a home healthcare agency that operated in the Dallas area. Alliance referred patients to Medistat and Dr. Roy on occasion and engaged in business over a period of years, similar to several other home health agencies that worked with Dr. Roy. Eventually, Amadi was charged with and pled guilty to Conspiracy to Commit Health Care Fraud, in relation to his work at Alliance. (*See* Case No. 3:11-CR-30-B.) Amadi was sentenced to 37 months' imprisonment by Judge Boyle on November 5, 2015.

In November 2010, a local reporter, Becky Oliver, for Fox News, produced and aired a television news story regarding fraud in relation to home health care. Amadi and Alliance were discussed in the news piece. According to Amadi, shortly after the airing

of this news story, Dr. Roy called Amadi and asked Amadi to come to Dr. Roy's office. Amadi agreed.  When Amadi arrived at Dr. Roy's office, Amadi was "frisked" and patted down by Dr. Roy because, as Amadi understood, Dr. Roy wanted to ensure that Amadi was not wearing a wire.   According to Amadi, Dr. Roy was concerned that his (Dr. Roy's) name had come up in the Fox News investigation (even through Dr. Roy's name was not mentioned in the news piece) and was concerned that Amadi might be cooperating with government officials against Dr. Roy.   Amadi repeatedly tried to reassure Dr. Roy that the news report did not deal with Dr. Roy.

The government intends to elicit this information from Amadi regarding this encounter with Dr. Roy.  The government intends to introduce the video of the Fox report that led to the encounter between Dr. Roy and Amadi.

This evidence is "inextricably intertwined" with the charged offenses because it is evidence of Dr. Roy's criminal intent in Count One through Eleven.  In Count One, in order to secure a conviction for conspiracy to commit healthcare fraud, the government must prove the Dr. Roy knew that the agreement he had entered into with co-conspirators was unlawful and that joined in it with the intent to further the unlawful purpose of the agreement.   In order to secure a conviction on Count Two through Eleven, the government must prove that the defendant acted "knowingly and willfully" in executing the scheme to defraud.   The evidence regarding Dr. Roy's meeting with Amadi is evidence of that intent.

The government will argue that Dr. Roy frisked and patted down Amadi because he wanted to make sure that his conversation with Amadi was not recorded or monitored

by law enforcement agents or other investigative bodies.  This meeting and conversation was spurred by the Fox news report, which alerted Dr. Roy that at least one well-known investigative reporter was conducting an investigation into unscrupulous practices in the home health industry.  As will likely be shown at trial, Dr. Roy was the most well-known home health doctor in the Dallas area during this time frame and, as his interactions with Amadi suggest, he identified himself as a potential target of further investigations.  It is highly unlikely that Dr. Roy would feel the need to frisk or pat down Amadi if he was acting appropriately and legally and if his conversation would not reference or implicate illegal actions.

Even if the Court somehow determined that this evidence was not inextricably intertwined or is actually an entirely different "wrong" or "act," it would still be admissible under Fed. R. Evid. 404(b) because – if it is deemed another bad act – it proves intent of the charged crime, as well as preparation, plan knowledge, absence of mistake, and lack of accident.  This is for the same reason described above.  The frisking and pat down of Amadi evidences Dr. Roy's knowledge that his other actions could be the object of an investigation and that he sought to avoid having the content of his conversation with Amadi transmitted or recorded for use by investigators.

*Issue No. 3:   Ferguson Ikhile and Muhammad Usman Testimony* – The government intends to call Ferguson Ikhile and Muhammad Usman as witnesses in the government's case-in-chief and elicit information from each of their companies regarding the relationship between Dr. Roy/Medistat and the companies run by these witnesses.

Ikhile was a registered nurse and, administrator, and owner of PTM Healthcare Services, Inc. ("PTM"), a company that provided skilled nursing, aid care, and other contracted-for services.   PTM opened in or around 2005/2006.   In or around 2010, Medicare payments to PTM were suspended.   Eventually, Ikhile was charged with and plead guilty to Conspiracy to Commit Health Care Fraud, in relation to his work at PTM. (*See* Case No. 3:12-CR-312-K.)   On January 14, 2015, Ikhile was sentenced to 72 months incarceration, three years of supervised release, and restitution in the amount of $5,066,871.36.

The government anticipates that Ikhile will testify that he learned of Dr. Roy's reputation in the home health industry and sought to use him because he was more willing to certify patients for Medicare home health than other doctors.[3]   Ikhile will explain that Dr. Roy was the medical director for PTM when PTM first began and, in exchange, Dr. Roy wanted PTM to refer as many patients as possible to Dr. Roy.   Ikhile will testify that when he first started PTM, he falsified medical documentation related to certain patients and that Dr. Roy approved the patients for Medicare home health nonetheless.   The government anticipates that Ikhile will testify that Dr. Roy declined a patients' plan of care on rare occasions and generally because the patients were already being seen by another home health agency, not because their symptoms did not qualify for Medicare home healthcare services.

---

[3]     In March 2012, prior to being charged with a crime, Ikhile was interviewed by agents and stated that, although PTM did work with Dr. Roy:  (1) Ikhile had never met Dr. Roy, (2) PTM never referred patients to Dr. Roy, and (3) Dr. Roy never paid PTM. The government anticipates that Ikhile will explain to the jury why he lied to agents during that interview.

Ikhile will also testify that following Dr. Roy's arrest, PTM still had several patients who were under the care of Dr. Roy. Ikhile received a phone call from a practitioner (presumably Dr. Stella Green) and that he/she owned a company in Grand Prairie and that he/she could continue to see Dr. Roy's patients. This testimony, as it is hearsay, will not be admitted for the truth of the matter asserted, but rather for the affect it had on the listener – that is Ikhile. Following this conversation, Ikhile transferred his patients to this practitioner.

Ikhile will also explain how he committed healthcare fraud through his company, what diagnoses he would use, how he would complete false medical documentation, and how he submitted bills in order to ensure maximum payments from Medicare.

Muhammad Usman was the owner and operator of Royal Ambulance and First Choice EMS – both of which were ambulance transport companies. The government anticipates that Usman will testify that he met Dr. Roy through business interactions and they discussed Dr. Roy serving as a medical director for Usman's companies. Usman will also testify that he (Usman) had trouble obtaining physician signatures for Patient Certification Statements, which were required for Medicare to pay claims (similar to a POC or 485). Dr. Roy offered to sign these forms in exchange for a $100 fee per form, even though Dr. Roy was not the treating physician.

This testimony is evidence that goes to the heart of the allegations in the Superseding Indictment. Dr. Roy is charged with conspiring with various HHAs to defraud Medicare. Ikhile's company, PTM, was one of those HHAs. In fact, it was one of the more prolific HHAs in terms of claims submitted with Dr. Roy having been listed

as the referring physician.  The government anticipates that Ikhile will testify that a Medistat physician was the authorizing doctor for over 50% of PTM's patients.

Similarly, Usman ran a company that entered into an improper financial arrangement, whereby Dr. Roy's signature was used to falsify forms.  This is one of the central claims of the government's case.

Even more specifically, in paragraph 32 of the Superseding Indictment, the government alleges that "co-conspirators known and unknown, recruited Medicare beneficiaries to be placed at the respective HHA so that their respective HHA could bill Medicare for unnecessary home health services."  Ikhile is one of those conspirators and the government anticipates that he will testify that he did just as was alleged in paragraph 32.

In paragraph 33 of the Superseding Indictment, the government alleges that certain co-conspirators falsified medical documentation to make it appear that the recruited beneficiaries qualified for home healthcare services.  The government anticipates that Ikhile will testify to these exact facts and admit that he falsified medical documentation, which Dr. Roy approved, to make it appear that the beneficiaries he or others at PTM recruited did, in fact, qualify for home healthcare services.  Likewise, Usman and Dr. Roy falsified forms each and every time Dr. Roy certified a patient in exchange for the $100 fee.

As noted above, the government has also alleged in the Superseding Indictment that Medistat utilized a fraudulent business model and one that relied on improper referrals from HHAs.  The government anticipates that Ikhile and Usman will testify that

Dr. Roy sought to have this exact arrangement with their companies, in exchange for Dr. Roy serving as a medical director. Thus, once again, Ikhile's and Usman's testimony strikes right through the allegations contained in the Superseding indictment and are not properly considered Rule 404(b) evidence.

Again, if the Court were to somehow deem Ikhile's and Usman's testimony to represent something outside of the charged offenses, the testimony would still serve as proof of Dr. Roy's intent, plan, knowledge, absence of mistake, and lack of accident – under Fed. R. Evid. 404(b) – with regard to the charged offenses. The interaction and relationship with Ikhile and Usman is no different in most respects to his relationship with the owners and administrators of Apple, Ultimate, and Charry – that is the named HHAs in the Superseding Indictment. To the extent that Dr. Roy were to argue that any fraudulent billing by these agencies was a mistake and one he was not aware of, Ikhile's and Usman's testimony would refute such a notion. To the extent that Dr. Roy argued he was not aware that HHAs were submitting falsified medical documentation to him or Medistat for certification, Ikhile's and Usman's testimony would contradict such a proposition.

Further, Ikhile's testimony would be used to show the knowledge that Dr. Roy, Stiger, Veasey, and Eleda had with regard to conspiratorial scheme. The government anticipates that Ikhile (just like Stiger, Veasey, and Eleda) will testify that he knew his relationship with Dr. Roy was improper and the agreement by him to refer patients to Dr. Roy was improper and part of an overall scheme to defraud Medicare. The government anticipates that Ikhile will also testify that he knew that the fact that 50% of PTM's

patients were treated by Dr. Roy was highly unusual for an HHA that operated in a legal manner.  Thus, such testimony is evidence of the knowledge of each of these defendants regarding their conduct.

*Issue No. 4:  Dr. Roy's Requests to Others to Open Nominal Companies* – The government intends to elicit, through multiple witnesses, that Dr. Roy requested, instructed, or discussed with them about opening a nominal company or business that Dr. Roy would ultimately control.

The government anticipates that witness and co-defendant Teri Sivils will testify that Dr. Roy asked her to open up a durable medical equipment ("DME") company.  Dr. Roy explained that he would own the DME company and would pay Sivils a small percentage of the businesses' profits.  Sivils recalls specifically that Dr. Roy wanted to make sure that Sivils understood that the company would be Dr. Roy's but that Sivils would run the company.  Ultimately, Sivils declined Dr. Roy's offer with regard to the DME company because she was not comfortable with the idea.  According to Sivils, Dr. Roy appeared to be angry when Sivils informed Dr. Roy of this decision.

Similarly, the government intends to elicit testimony from witness Terry Braswell regarding Dr. Roy's request that she open a company.  Braswell served as a nanny for Dr. Roy and Louise Lamarre in the 1990s and early 2000s.  Braswell lived with the Roy family for several years.  Toward the end of her employment, Dr. Roy asked Braswell whether she wanted "to make a quick $5,000?"  Dr. Roy had paperwork in his hands and told her that if she put her name as the owner of the business, he would pay her $5,000.  Braswell did not know what type of business this was or what the paperwork he wanted

her to fill out. Braswell refused as she was concerned about the ramifications. Braswell later mentioned the incident to Dr. Louise Lamarre (Dr. Roy's wife).

This evidence is inextricably intertwined with the charged offenses because it is evidence of Dr. Roy's fraudulent business, as outlined in the Superseding Indictment. Dr. Roy sought to open these companies through other people so that he could operate the fraud or continue to operate the fraud against Medicare. Dr. Roy knew that if the companies were in his name, Medicare would disallow or restrict billing through these companies. This is because, as Dr. Roy knew, the Stark Law prohibits physician referrals of certain health services or products for Medicare or Medicaid patients if the physician (or an immediate family member) has a financial relationship with the entity. Dr. Roy could not open a company and refer patients to that company, so he had to devise a scheme to hide his ownership from regulators. The Superseding Indictment alleges that Dr. Roy engaged in a variety of illegal and inappropriate arrangement or agreements with other companies in an effort to hide facts from regulators. The above-described evidence is part and parcel of Dr. Roy's approach to running Medistat.

If the Court determines that this evidence is not inextricably intertwined, then it would also be evidence of Dr. Roy's intent, absence of mistake, and lack of accident. As noted above, Dr. Roy sought to convince others to open a company under their name but that he would control. This is identical to what he asked J.A. to do, as alleged in paragraphs 47 to 50 of the Superseding Indictment. Thus, this evidence would corroborate J.A.'s testimony as to Dr. Roy's intent with regard to the creation and control

of this company and would refute any argument by the defense that this was just a misunderstanding with J.A. or that J.A. was confused as to Dr. Roy's intentions.

***Issue No. 5:  Stiger's Request that Jennifer Elder Open Other Companies*** – The government intends to elicit testimony from witness Jennifer Elder that defendant Cynthia Stiger requested that Elder open a DME business and another home health agency ("HHA") that Stiger would ultimately control.

Elder served as a marketer for Apple.  Regardless of the Court's ruling on the instant issue, Elder will be called to testify about her interactions with Stiger and Veasey and their marketing practices.  In addition, and as relevant to this Notice, the government will elicit testimony from Elder regarding Stiger's request that she open a DME company and an HHA.

Sometime after 2008, Stiger approached Elder and suggested that Elder open a DME company for Stiger that Elder could run for Stiger.  Elder agreed and worked to open a company called First Response Medical Supply ("FRMS").  Elder applied for and received a Medicare number for FRMS.  Once Elder had obtained the necessary licenses and accreditations, Stiger placed her son in charge of the business and asked Elder to simply market for the company.  Elder will testify that Apple sent referrals for DME orders to FRMS, which Elder believed to represent a conflict of interest.

In or around the same time, Stiger also instructed Elder to open another HHA that would be known as "1st Aide."  Elder obtained the proper licensure for 1st Aide but will testify that although she was running 1st Aide on paper, Stiger was in charge of the company.

Dr. Roy signed certifications for both companies – FRMS and 1st Aide.  When Elder raised questions with Stiger about the apparent conflict of interest raised by the ownership of these companies and Dr. Roy's role with these companies, Stiger ignored her or rolled her eyes at Elder.

Like Issue No. 4 above, this evidence is inextricably intertwined with the charged offenses because it is evidence of Stiger's willingness to enter into arrangement or agreements to defraud Medicare and her collusion with Dr. Roy in this regard.

If the Court determines that this evidence is not inextricably intertwined, then it would also be evidence of Stiger's intent, absence of mistake, and lack of accident. Stiger (along with Veasey) is accused of entering into an improper arrangement with Dr. Roy regarding Apple.  In that arrangement, Dr. Roy provided the financial support to get Apple up and running and to operate in its early existence.  The government alleges that this was done so that Apple would refer patients to Dr. Roy.  Again, this would be a violation of the Stark Law and represented a fraud committed against Medicare.  Stiger's attempts to do the same type of thing through Elder evidence her intent and lack of mistake in entering into this agreement with Dr. Roy.  It shows that she was not some passive actor, who was taken advantage of by Dr. Roy, but, rather, was a knowing participant in the scheme to defraud.

***Issue No. 6:  Dr. Roy's Provision of DME and Prescriptions to Patients*** – The government anticipates that several witnesses, in the midst of other testimony, will testify regarding Dr. Roy's willingness to over-prescribe medications and durable medical equipment to Medicare patients that he was treating.

As just one example, the government anticipates that witness Juan "Augie" Galindo, who served as a Nurse Practitioner for Medistat, will testify that Dr. Roy often prescribed unnecessary medical equipment to patients in order to keep the patients happy with Dr. Roy. Galindo recalls a specific patient, D.M., who requested that he be prescribed a wheelchair. Galindo refused because he did not believe that D.M. required a wheelchair. Ultimately, Dr. Roy overrode Galindo and prescribed the wheelchair to D.M.

Similarly, the government anticipates that certain Medistat employees, who will be called by the government, including Michele Avila and Audrey Sanders, will testify that Dr. Roy unnecessarily prescribed medications to Medicare patients that were being seen by Medistat providers.

This evidence is part and parcel of the Superseding Indictment which generally alleges that Dr. Roy and his conspirators, sought to expand and maintain their patient roster (and, in turn, the money they collected from Medicare) through any means necessary, including the falsification of records (paragraphs 33, 35-37), illegal financial arrangements (paragraphs 48, 52-54, 56-61, 66-67), outright bribes to patients (paragraph 47), and bribes from HHAs (paragraph 25). Similarly, Dr. Roy offered to provide patients with certain medical equipment in order to keep them happy and to keep them as patients, which allowed him to continue to bill Medicare for unnecessary medical visits.

The fact that the government did not specifically allege that Dr. Roy provided this DME to patients in the Superseding Indictment is of no moment. As other courts have noted, Rule 7(c) of the Federal Rules of Criminal Procedure requires an indictment to be

"concise" and contain "essential facts," but does not require the indictment to include every fact to be alleged by the government.  *See United States v. Moyer*, 674 F.3d 192, 203 (3d Cir. 2012).

If the Court determined that this evidence represented other bad acts, it would still be evidence of Dr. Roy's overall plan to defraud Medicare.  In order to continue to fraudulently bill Medicare, it was necessary for Dr. Roy to retain patients.  He both had to do this directly and through his contacts with HHAs, who also sought to retain these patients.

*Issue No. 7:  Items Recovered from Dr. Roy's Residence* – The government will seek to introduce, through investigative agents, evidence recovered from Dr. Roy's residence related to his plan to flee the country, hide assets, and enjoy the fruits of the scheme to defraud for years to come, having avoided prosecution for his crimes.

On June 2, 2011, the government executed a search warrant at Dr. Roy's residence.  At that time, agents recovered, among other items,:

- A book entitled "Hide You're A$$ET$ and Disappear – A Step-by-Step Guide to Vanishing Without a Trace"

- A book entitled "Complete Guide to Offshore Money Havens – How to Make Millions, Protect Your Privacy and Legally Avoid Taxes"

- A pamphlet entitled "The Offshore Money Manual – How to Send Money Overseas Swiftly, Privately, and Profitably"

- Two different fake identities that contain Dr. Roy's picture but contain the name of Michel Poulin.

- A variety of documents related to the "Michel Poulin" identity, including falsified bank records, government documents from Quebec, passport application forms, and postal office records, among others.

This evidence is part and parcel of the overall scheme to defraud the United States government.  The government will argue that, as part of his scheme, Dr. Roy sought to hide his assets and disappear with the money he stole from taxpayers.  Dr. Roy was fully aware that regulators and investigators could eventually catch up to him and seek to recoup the monies that he and his co-conspirators had stolen.

As discussed in the Superseding Indictment, once Medistat and Dr. Roy were suspended by Medicare form further billing, he took significant and considerable efforts to cover-up his crime and to continue to bilk the government of additional monies.  In Count Seventeen, which charges Dr. Roy with Obstruction of Justice, the government alleges that Dr. Roy sought to "continue to receive Medicare reimbursement funds despite being on notice that Medistat was the subject of a pending proceeding and suspended from receiving Medicare monies by CMS."  The evidence described above is further proof of Dr. Roy's overall plan to hide proceeds and money from investigators, just like he hid money through Medcare HouseCalls.

If the Court determines that this evidence is not "inextricably intertwined" with the charged offenses, it still remains evidence of Dr. Roy's preparation and plan to steal money from the government through the charged conspiracy.  This evidence indicates that Dr. Roy planned to hide money overseas and potentially disappear.  Also, because the books referenced above were found on a bookshelf in a study in his house, which he appeared to share with his wife, it did not appear that he was seeking to disappear and

hide assets from his wife or family, but rather that his plan was to hide money from the government and disappear if law enforcement went looking for him.

A case from the United States District Court for the Northern District of Georgia is instructive.  In *United States v. Dooley*, 2011 U.S. Dist. LEXIS 59324 (N.D. Ga. June 2, 2011), the government sought to introduce evidence that indicated the defendant was preparing to flee.  This evidence included a letter from the defendant to his wife, a check, and photograph.  The Court found that:

> even if this evidence was considered "extrinsic," it qualifies for an explicit Rule 404(b) exception. The items show defendant's "preparation" and "plan" to flee from his trial and leave the judicial district.  They are thus relevant to an issue other than defendant's character.

*Id.* at *17.[4]   Similarly, attempts to flee have traditionally been considered probative of consciousness of guilt. *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("Headlong flight . . . is not necessarily indicative of wrongdoing, but is certainly suggestive of such."); *California v. Hodari D.*, 499 U.S. 621, 623 n.1 (1991) ("'The wicked flee when no man pursueth.'" (quoting Proverbs 28:1))

Likewise, in *United States v. Barnhart*, 889 F.2d 1364 (NDTX 1989), the Fifth Circuit upheld Judge Fish's decision to admit evidence regarding statements by the defendant regarding flight.  The government introduced evidence that the defendant stated that "Bogota looked real good this time of year" and that he tried to get "invisible"

---

[4]    Dooley was also charged with failing to appear for trial, making it easier for the Court to determine that the evidence was intrinsic.  Its analysis of the Rule 404(b) issues, however, is still instructive.

after arrest but "couldn't run fast enough or far enough." *Id*. at 1378.  On appeal, the defendant argued that these statements were not themselves evidence of flight or accompanied by other evidence of flight, and thus not admissible. *Id*.  The Fifth Circuit disagreed and concluded that the statements have "high probative value" and "was clearly admissible against him on grounds other than flight," including state of mind, intent, and knowledge. *Id*. at 1378-79.[5]

As the Fifth Circuit had previously stated, "[i]t is today universally conceded that the fact of an accused's flight, escape from custody, resistance to arrest, concealment, assumption of a false name, and related conduct, are admissible as evidence of consciousness of guilt, and thus of guilt itself." *United States v. Ballard*, 423 F.2d 127 (5th Cir. 1970) (citations omitted); *see also United States v. Templeton*, 624 F.3d 215, 225 (5th Cir. 2010) ("The record reflects that Templeton traveled to Topeka before Christmas, about a month after the murder, and stayed in an extended stay hotel room under an assumed name, paying cash for the room.  We have previously found that similar evidence supports an inference of flight, and the fact that Templeton did not flee until approximately one month after the crime does not undermine this inference.")

Likewise, other courts have found that the possession of false or fake identities is properly admissible under Rule 404(b).  In *United States v. Morrow*, 2005 U.S. Dist. LEXIS 23512 *74 (D.D.C. Apr. 7, 2005), the District Court found that "evidence of false identities before the relevant conspiracy period charged shows preparation, plan, and

---

[5]    The Court did find that there was insufficient evidence for the District Court to instruct the jury on intentional flight and its relationship to consciousness of guilt, but that is not being requested by the government at this time and is thus inapposite.

identity -- permissible considerations under Rule 404(b)."  The Court noted that "the use of fraudulent identities is not particularly prejudicial; while showing perhaps an "illegal act," it certainly does not arise to the level of a dangerous crime or conviction."  *Id*.

Clearly, this evidence would be presented for reasons other than to show a mere propensity or disposition on the part of the defendant to commit the crime, and thus it would be admissible under Rule 404(b).  *See Huddleston v. United States*, 485 U.S. 681 (1988).

## **CONCLUSION**

The government respectfully requests a ruling from the Court before trial regarding the admissibility of the above-described categories of evidence.

Respectfully submitted,

JOHN R. PARKER
ACTING UNITED STATES ATTORNEY

**/s/  *P.J. Meitl***
P.J. MEITL
Assistant United States Attorney
D.C. Bar No. 502391
Virginia Bar No. 73215
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone: 214.659.8680
Facsimile: 214.659.8809
Email: philip.meitl@usdoj.gov

**/s/ *Nicole Dana***
NICOLE DANA
Special Assistant United States Attorney
Texas State Bar No. 24062268
1100 Commerce Street, Third Floor
Dallas, Texas  75242-1699
Telephone: 214.659.8694
Facsimile: 214.659.8805
Email: nicole.dana@usdoj.gov

**/s/ *Chad E. Meacham***
CHAD E. MEACHAM
Criminal Chief
Texas State Bar No. 00784584
1100 Commerce Street, Third Floor
Dallas, Texas  75242-1699
Telephone: 214.659.8716
Facsimile: 214.767.4100
Email:  chad.meacham@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

On November 6, 2015, I electronically submitted the following document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court.  I hereby certify that I have served all counsel and/or pro se parties of record electronically or by another manner authorized by Federal Rule of Criminal Procedure 49(b).

<u>s/ *P.J. Meitl*</u>
P.J. Meitl
Assistant United States Attorney