IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

UNITED STATES OF AMERICA

v.                                          CRIMINAL NO.   3:12-CR-00054-L

JACQUES ROY, M.D., ET AL

## GOVERNMENT'S TRIAL BRIEF

The United States submits this trial brief in support of the evidence it intends to present in its case-in-chief.   The brief's purpose is to provide the Court with an overview of the different kinds of evidence the government will seek to admit at trial, the evidentiary bases for the admission of that evidence, and the law associated with that evidence.   The government asks that the Court consider this brief, along with its other notices and motions in limine, when evaluating the evidentiary issues in this case.

## I.

## Factual Background[1]

At trial, the government will prove, beyond a reasonable doubt, that the remaining four defendants engaged in a large-scale, sophisticated health-care fraud scheme.   In Count One of the Superseding Indictment, the government charged these remaining four defendants with a conspiracy to commit healthcare fraud, pursuant to 18 U.S.C. § 1349.   (*See* Dkt. No. 131.)   In that count, the government alleges that the defendants

---

[1] This factual background is borrowed heavily from the Government's Notice of Intent to Offer Evidence Potentially Relevant to Federal Rule of Evidence 404B.

**U.S. v. Jacques Roy, M.D. et al**
**Government's Trial Brief - Page 1**

conspired with each other and with others to defraud Medicare and Medicaid through companies that the defendants owned and/or controlled.[2]

As part of the conspiracy, defendants Stiger, Veasey, Eleda, and others improperly recruited individuals with Medicare coverage (hereinafter "beneficiaries") to sign up for Medicare home health care services.  Defendant Eleda and other nurses would falsify medical documents to make it appear as though those beneficiaries qualified for home health care services that were not medically necessary.[3]  These nurses, including Eleda, then prepared Plans of Care (that is, a document which outlined the plan of treatment for that beneficiary) that were not medically necessary.   These Plans of Care, which were also known as POCs or 485s ("485" is the standard form number on which a Plan of Care is completed), were then delivered to Dr. Roy or another physician working under his direction at Medistat.

Once the POCs were delivered to Medistat, Dr. Roy instructed his staff to certify these POCs, which indicated to Medicare and Medicaid that a doctor (typically Dr. Roy) had reviewed the treatment plan and had deemed it medically necessary.   In doing so, that doctor (typically Dr. Roy) certified that the patient required home health care services, which were only permitted to be provided to those individuals who were homebound and

---

2 These companies included, among others, Medistat Group Associates, P.A. ("Medistat"), Apple of Your Eye Health Care Services, Inc. ("Apple"), Ultimate Care Home Health Services ("Ultimate") and Charry Home Care Services, Inc. (Charry").

3 The Superseding Indictment has been summarized for purposes of this Factual Background.   Any omissions from or differences from the Superseding Indictment should not be deemed as an acknowledgment or concession regarding any part of the alleged scheme.   Instead, this Factual Background was meant to provide a brief overview of the case.   The government stands by each of the facts alleged in the Superseding Indictment.

**U.S. v. Jacques Roy, M.D. et al**
**Government's Trial Brief - Page 2**

required skilled nursing, among other requirements.   As noted in the Superseding Indictment, this process was repeated for "thousands" of POCs.   (*See* Dkt. No. 131 at 12, ¶ 36.)   In fact, Medistat's office included a "485 Department," which effectively served as a boiler room for the affixation of fraudulent signatures and certifications.

Once an individual was certified for home health care services, nurses, who worked for Stiger, Veasey, and Eleda, among others, then falsified visit notes to make it appear as though skilled nursing services were being provided and continued to be necessary.   Dr. Roy would also visit the patients, perform unnecessary home visits, and then order unnecessary medical services for the recruited beneficiaries.   Then, at Dr. Roy's instruction, Medistat employees would submit fraudulent claims to Medicare for the certifications and re-certifications of unnecessary home healthcare services, and other unnecessary medical services.

As outlined in the Superseding Indictment, the scope of the fraudulent business mode utilized by Dr. Roy was massive – Medistat processed and approved POCs for 11,000 unique Medicare beneficiaries from more than 500 different home health agencies. The Superseding Indictment also alleges that Dr. Roy entered into formal and informal fraudulent arrangements with Apple, Charry, and other home health agencies to ensure that his fraudulent business model worked and that he maintained a steady stream of Medicare beneficiaries.   Details of these fraudulent arrangements are provided in the Superseding Indictment and will be further discussed below as the government outlines the evidentiary issues that may arise at trial.

Finally, the Superseding Indictment also alleges that, when the Centers for Medicare and Medicaid Services (CMS) suspended Dr. Roy and Medistat from further billing in June 2011 because of suspected fraud, Dr. Roy sought an end-run around the suspension through the use of another company, Medcare HouseCalls.   Dr. Roy directed the medical providers he employed to be re-credentialed and to bill Medicare under Medcare HouseCalls, as opposed to Medistat.   Nonetheless, the money that was paid by Medicare was circumvented back to Medistat and Dr. Roy.

In Counts 2 through 11, Dr. Roy, Veasey, and Eleda are charged with individual counts of healthcare fraud, pursuant to 18 U.S.C. §§ 1347 and 2.   (*See* Dkt. No. 131.) These counts illustrate the fraudulent scheme outlined above, as the government will provide evidence regarding the recruitment of each beneficiary and the fact that they were not homebound or in need of skilled nursing services, as well as evidence that each maintained their own primary care physician who oversaw their care.

In Counts 12 through 14, Eleda is charged with making False Statements for Use in Determining Rights for Benefits and Payments by Medicare, pursuant to 42 U.S.C. § 1320a-7b(a)(2).   (*See* Dkt. No. 131.)   These counts relate to submissions made by Eleda regarding care she allegedly provided even though she was not even present in the country at the time of the alleged care.

In Counts 15 and 16, Dr. Roy is charged with making False Statements Relating to Healthcare Matters, pursuant to 18 U.S.C. § 1035.   (*See* Dkt. No. 131.)   These charges

relate to the Medcare HouseCalls cover-up and the fact that these claims indicated that they were unassociated with Medistat, when in fact, they were Medistat patients.

Finally, Count 17 alleges that Dr. Roy obstructed justice, under 18 U.S.C. § 1505, when he directed Medistat employees to bill Medicare for home visits under the Medcare HouseCalls provider number so that he could continue to receive Medicare funds, even though he had been suspended by CMS.

In its case-in-chief, the government intends to call approximately 70 witnesses,[4] including: former employees of Medistat, Apple, and Charry; employees of The Bridge, a homeless shelter where Eleda recruited patients; a number of co-conspirators, who will discuss their dealings with Dr. Roy, Veasey, and Stiger; beneficiaries for whom Dr. Roy authorized services, who will testify as to how they were recruited to receive home health care services and their condition during the time they received services; and primary care physicians for those beneficiaries, who will testify regarding the care they provided the beneficiaries during times when Dr. Roy also provided unnecessary home health care services.   The government also intends to introduce approximately 500 exhibits, including, but not limited to: patient files and other evidence seized from the defendants' businesses; Medicare and Medicaid manuals and regulations; Medicare claims data; financial records showing the payment of Medicare funds to the defendants' accounts; contractual evidence between co-conspirators demonstrating a financial arrangement;

---

4 This number does not include approximately 40 custodial witnesses that must be called if the defense does not stipulate to the authenticity of certain evidence.

audio and video evidence; text messages; and summary charts of the above evidence, where appropriate.

## II.
## Evidentiary Issues

In its case-in-chief, the government intends to prove its case through a combination of lay witness testimony and documents.   Below is a brief summary of the types of evidence upon which the government intends to rely, the method of the government's questioning to elicit this testimony, and the possible legal issues that may arise in offering such testimony.   In each instance, the government submits that the evidence it intends to offer is admissible under the Federal Rules of Evidence.

## A.    Testimony

### 1.    Non-Hearsay

Hearsay is an out-of-court statement that a party offers "to prove the truth of the matter asserted."      FED. R. EVID. 801(c)(2).   The government will seek to admit three types of out-of-court statements that are nonetheless *not* hearsay under the Federal Rules of Evidence: 1) statements made by co-conspirators in furtherance of the conspiracy; 2) admissions by party opponents; and 3) statements not offered for their truth.

### a.    Co-conspirator Statements[5]

Statements made by co-conspirators in furtherance of a conspiracy are not hearsay. FED. R. EVID. 801(d)(2)(E).   In order for a co-conspirator statement to be admitted as

---

5 This section provides a brief overview of the law and facts on this issue.   To facilitate the admission of this evidence and the presentation of the government's case, the government may provide separate briefing on the legal and factual issues surrounding the significant amount of co-conspirator statements present in its case-in-chief.

non-hearsay the government, as the party seeking to admit the statement, must prove by a preponderance of the evidence "(1) the existence of a conspiracy, (2) [that] the statement was made by a co-conspirator of the party, (3) [that] the statement was made during the course of the conspiracy, and (4) [that] the statement was made in furtherance of the conspiracy." *United States v. Delgado*, 401 F.3d 290, 298 (5th Cir. 2005) (quoting, among other cases, *United States v. Robinson*, 367 F.3d 278, 291–92 (5th Cir. 2004)).   In making this preliminary determination, the Court may consider the very statements the government seeks to admit.   *See Bourjaily v. United States,* 483 U.S. 171, 181 (1987).

In this case, the government intends to offer a number of statements made by Dr. Roy, Stiger, and Veasey, which both established and furthered the conspiracy.   These statements will be sponsored by both convicted co-conspirators, such as Cyprian Akamnonu and Teri Sivils, who both pled guilty to Conspiracy to Commit Healthcare Fraud, and uncharged witnesses, such as J.A.

For example, Cyprian Akamnonu is expected to testify that, sometime in 2003 or 2004, he attended a meeting with Stiger and Veasey, in which they agreed to recruit beneficiaries for his company, Ultimate, at the "going rate" of $300 per beneficiary. Akamnonu is also expected to testify that Stiger and Veasey facilitated his introduction to Dr. Roy, who then began certifying Ultimate's recruited beneficiaries.   The essence of the conspiracy charged in the indictment is that Dr. Roy was the spout from which Medicare money flowed – if a home health care agency brought him a beneficiaries, he would authorize services for that beneficiary.   As a result, companies like Apple, Ultimate, and

Charry had one primary objective: to find beneficiaries willing to receive these services, whether they were eligible or not.   Stiger and Veasey's agreement to recruit beneficiaries for Akamnonu, as well as their role in introducing him to Dr. Roy, were made in furtherance of the conspiracy.   "Ordinarily, a statement that identifies the role of one co-conspirator to another is in furtherance of the conspiracy."   *United States v. Lechuga,* 888 F.2d 1472, 1480 (5th Cir. 1989), *quoting United States v. Magee,* 821 F.3d 234, 244 (5th Cir. 1987).

The government will also present several statements made by co-conspirators that speak to their efforts to conceal and continue the scheme.   Through J.A., the government intends to present evidence that, while traveling to a home health care conference in November 2004, J.A. overheard conversations between Dr. Roy and Stiger, in which they discussed "ping-ponging" patients between Apple (Stiger's agency) and a home health care agency J.A. intended to open.   J.A. is expected to testify that "ping-ponging" patients was necessary to avoid drawing the attention of Medicare if any patient were served by one home health care agency for a significant period of time.

In a similar vein, Teri Sivils is expected to testify regarding countless interactions with and directives received from Dr. Roy: that Medistat's employees needed to churn out paperwork by signing POCs; that any employees signing POCs needed to practice his signature to ensure it always looked the same; and that Sivils should create a referral sheet for home health care agencies to use so that the agencies themselves could complete the sections allotted for patient information after patients were recruited and fax it to Medistat

for his signature, making it seem, once signed, that the referral originally came from

Medistat.   "Efforts to conceal a conspiracy obviously can further the conspiracy by

assuring that the conspirators will not be revealed and the conspiracy brought to an end."

*United States v. Phillips,* 219 F.3d 404, 419 (5th Cir. 2000).

The government will also present a significant number of documentary evidence

that furthered the conspiracy.   These documents include a 2006 handwritten agreement

between Dr. Roy, Stiger, and Veasey:   in exchange for $12,000 each month for business

and living expenses, Dr. Roy would expect 50 percent of the profits from Stiger and

Veasey's company, Apple.   Additionally, Akamnonu wrote a letter in 2007 to Dr. Roy

citing their illegal agreement – or "special deal," as the letter states – in which Akamnonu

complained that Dr. Roy had not fulfilled his end of their agreement by failing to sign

POCs, without which, Ultimate could not bill for services.

As stated above, the Court may consider these very statements and documents in

determining whether a conspiracy existed at the time they were made and, given that they

cover both the inception of the conspiracy and the parties' attempts to keep it alive and

fruitful, these statements alone should be sufficient.   However, the government also

intends to introduce independent evidence of conspiratorial agreements between the

defendants.   For example, Medicare claims data indicates that 69 percent of Apple's

beneficiaries were certified by a Medistat physician, while 72 percent of Ultimate

beneficiaries were certified by a Medistat physician.   Mark Porter and Lisa Garcia, the

government's non-expert program witnesses, are expected to testify that no more than

15-20 percent of any home health care agency's patients should be certified by a single physician; if the percentage were greater, there would be reason to suspect an improper arrangement between the physician and the agency.   Moreover, financial information supports the contention that a conspiracy existed: bank records show that, in 2006, either Dr. Roy (or, from Medistat's business account) provided over $300,000 to Apple, and that Apple subsequently paid Dr. Roy (or, to Medistat's business account) almost $190,000 in funds – consistent with the illegal agreement discussed above.   Financial records further show that Ultimate paid Roy regularly for his role as "medical director" for Ultimate, despite the fact that, as he will testify, Roy provided no services consistent with that role. Finally, the government has exhibited the factual resumes of Akamnonu, Patricia Akamnonu, and Sivils, in which they admit to taking part in a conspiracy to commit health care fraud.   All of this evidence independently verifies the existence of the conspiracy by a preponderance of the evidence.

All of these co-conspirator statements are also admissible against Eleda.   Factually, Eleda entered the conspiracy after Dr. Roy, Stiger, and Veasey, as Charry did not begin billing for services until 2010.   However, should Eleda object to the admission of the statements described above because they were made prior to her entry into the conspiracy, such an argument "misperceives the law."   *United States v. Gonzales-Balderas,* 11 F.3d 1218, 1224 (5th Cir. 1994).   "[A] conspiracy is like a train[;] when a party knowingly steps aboard he is part of the crew and accepts responsibility for the existing freight [it is already carrying]."   *United States v. Barksdale-Contreras*, 972 F.2d 111, 114 (5th Cir.

1992) (alteration in original) (citing *United States v. Baines*, 812 F.2d 41, 42 (1st Cir.

1987)).   The fact that a challenged statement was made prior to the defendant joining the

conspiracy is "of no consequence" as long as "independent evidence clearly revealed his

subsequent knowledge and willingness to participate." *United States v. Osgood*, 794 F.2d

1087, 1093 (5th Cir. 1986).

Significant independent evidence exists to support the conclusion that Eleda

willfully participated in the same conspiracy to defraud Medicare.   Before providing

services through Charry, Eleda worked for DePromise Home Health Care.   Like the other

co-conspirators charged in this indictment, DePromise enjoyed an improper arrangement

with Dr. Roy, as 50 percent of DePromise's home health care patients were certified by a

Medistat physician.   When DePromise was shut down by federal investigators, Eleda

began billing services through Charry, armed with a DePromise patient list (which was

found at her home pursuant to a valid search warrant) and the knowledge that Dr. Roy

would certify all beneficiaries.   Claims data independently supports this theory:

Medistat certified 81 percent of Charry's beneficiaries, and 25 percent of those

beneficiaries were also former beneficiaries of DePromise.   Additionally, testimony will

show that Eleda paid recruiters, such as probable witness Kenneth Poe and deceased

witness Robert Washington, $50 for any Medicare beneficiary they could find staying at

The Bridge, a local homeless shelter in Dallas.   Those beneficiaries are expected to testify

that, once they were recruited, Eleda typically persuaded them to sign up for services by

buying them food.   These beneficiaries were certified for home health care by Dr. Roy,

who himself appeared at the Bridge to "treat" patients. As the evidence shows that Eleda also knowingly and willfully recruited beneficiaries to provide them unnecessary services, statements made by other co-conspirators prior to her entry into the conspiracy are fully admissible against her.

### b. Admissions by Party Opponents

The government also intends to offer a number of admissions from each defendant. Many of these admissions will be offered by government witnesses as they testify about their daily interactions with the defendants; others will be offered as letters or emails written by the defendants. The government also intends to introduce, through assorted law enforcement witnesses, statements made by these defendants in response to questioning from law enforcement.[6] Admissions are clearly admissible under the rules of evidence. FED. R. EVID. 801(d)(2)(A).

### c. Statements Offered for Reasons Other Than Their Truth

Additionally, while hearsay is generally inadmissible, many out-of-court statements do not fall within this definition because they are not offered for their truth. *See United States v. Parry,* 649 F.2d 292, 295 (5th Cir. 1981). Specifically, the government intends to provide certain out-of-court statements to provide context for other admissible testimony, to show that Stiger had notice of Veasey's improper recruiting of beneficiaries, but took no action to stop it, and to show the effect a deceased witness's statements had on law enforcement.

---

6 None of these statements were subject to motions to suppress.

First, the government intends to offer, through witness J.A., audio recordings of Dr. Roy, in which he discusses how Stiger and Veasey will recruit patients for his practice. As stated above, statements made by Dr. Roy in these recordings are not hearsay, as they are statements in furtherance of a conspiracy that implicate Stiger and Veasey.   However, J.A.'s statements in the recordings are also not hearsay because the government intends to offer them for the purpose of providing context for Dr. Roy's admissible statements.   *See generally United States v. Cheramie,* 51 F.3d 538, 541 (5th Cir. 1995) (witness's statements to a defendant in a recorded conversation admissible as "part of a reciprocal and integrated conversation").

Additionally, the government's case-in-chief will offer evidence of Apple's recruiting practices, which included Veasey traveling through neighborhoods and approaching patients in their homes, offering goods and services for beneficiaries who signed up for Apple's services.   Former Apple employee Brittany Anderson, who worked as the company's receptionist, received calls from patients' families and their primary care physicians, asking how the patient in question had been signed up for services.   Anderson relayed these complaints to Stiger, Apple's administrator, who took no action. Anderson's statements on this issue are admissible because they will not be offered to establish that Veasey actually recruited patients in this way,[7]  but rather to show that Stiger had notice of his recruiting practices, but found no fault with them, and, as a result, was a

---

7 Instead, evidence of Veasey's specific recruitment practices will come from testimony of Apple employees who witnessed it firsthand.

knowing and willful participant in the scheme to defraud. Statements offered to show that

a defendant had notice or knowledge of a particular fact, rather than for their truth, are

likewise admissible. *See United States v. Neuman,* 406 Fed.Appx. 847, 850-851 (5th Cir.

Dec. 28, 2010) (in counterfeit goods prosecution, emails from a witness offered as exhibits

by the prosecution were admissible when not offered for their truth, but rather to prove that

the defendant had notice of complaints regarding counterfeit merchandise).

In fact, at one point, Veasey was caught "red-handed" going door to door when he

solicited a patient whose family worked for a government health care agency. This

individual initially spoke to Anderson, explained the issue, and asked to speak to Stiger.

Anderson transferred the call and, shortly thereafter, Stiger attempted to distance herself

from Veasey by, ultimately, removing him from the board of directors. However, as

Apple employees are expected to testify, Veasey continued to recruit beneficiaries and

frequent the office. Again, the statements made by the complaining individual to

Anderson are not hearsay because they are not being offered for their truth, but rather to

show their effect on Stiger, who knew that she should appear to denounce Veasey's

practices because she knew them to be illegal.

Finally, the government's case-in-chief will feature evidence against Eleda

regarding her recruiting practices at The Bridge. Through Gary McLung and Jamal

Webb, who were employed as security guards at The Bridge, the government intends to

introduce statements made by Robert Washington, who died in 2013. According to

McLung and Webb, when they initially discovered Eleda at the Bridge, they began

questioning residents of The Bridge, including Washington, about why she was present. In response, Washington became angry and defensive, stating that he was "working" by recruiting beneficiaries for Eleda in return for money.   Washington's statements and reaction are important, because, according to McLung and Webb, he wanted to convince them that he did not believe he was doing anything that might cause him to be removed from the facility.

As a result of Washington's statements, McLung and Webb approached Eleda, learned that she was not authorized to be on the property, and escorted her off the premises. McLung and Webb are expected to testify that, despite this conversation with Eleda, she returned to the streets surrounding the Bridge to see patients and had to be chased from the premises on multiple occasions.   Ultimately, McLung and Webb notified the Dallas Police Department, who will testify to other facts concerning their subsequent investigation, as well as admissions made by Eleda.   As a result, Washington's statements will not be offered for their truth, but rather to provide background information for McLung and Webb's investigation into Eleda's presence at the Bridge and the actions they subsequently took.   *See generally United States v. Dunigan,* 555 F.3d 501, 507-508 (5th Cir. 2009) ("Testimony describing an investigation's background should not be needlessly objected to on hearsay grounds where it goes only to how police investigated a crime rather than to the truth of the matter asserted").

2.      Hearsay Admissible Subject to an Established Exception

The government also intends to introduce evidence that is admissible under myriad

exceptions to the hearsay rule, found at Rule 803.   Specifically, the government intends to

various forms of business records, as well as a significant amount of medical records.

### a.      Business Records

Business records are generally admissible as an exception to the hearsay rule.

Fed. R. Evid. 803(6).   The party seeking to admit the records must show, either through a

live witness or a certification that complies with the requirements of Rule 902(11) or (12),[8]

that: (1) the record was made at or near the time by, or from information transmitted by, a

person with knowledge; (2) the record was kept in the course of a regularly conducted

business activity; and (3) it was the regular practice of that business activity to make the

record.   *United States v. Ned,* 637 F.3d 562, 569 (5th Cir. 2011).   "There is no

requirement that the witness who lays the foundation for the admission of a record under

the business records exception of the hearsay rule be the author of the record or be able to

personally attest to its accuracy."   *United States v. Armstrong,* 619 F.3d 380, 384-85 (5th

Cir. 2010).   Instead, a proper witness is one who can explain the record-keeping system of

the organization and attest that the requirements of the business records exception are met.

*United States v. Jones,* 554 F.2d 251, 252 (5th Cir. 1977).

Generally, business records themselves are non-testimonial in nature, and their

admission into evidence without the author of the record does not violate the Confrontation

---

8 The government does not intend to introduce any foreign business records.

Clause of the Constitution.   *See Crawford v. Washington,* 541 U.S. 36, 56 (2004).

Likewise, if the written certification attesting to the authenticity of business records is

simply designed to meet the requirements of Rule 902(11), the certification is not

testimonial, and admission does not violate the Confrontation Clause.   *United States v.*

*Morgan,* 505 F.3d 332, 338-339 (5th Cir. 2007).

For domestic records to be admitted without a witness, they must meet the

requirements of Rule 902(11).   Under Rule 902(11), the certification must meet the

previously-listed elements for admissibility under Rule 803(6), and the party seeking to

admit the records through such certification must provide timely, written notice of the

intent, as well as copies of the records and the accompanying certification, to the opposing

party.   *See United States v. Olguin,* 643 F.3d 384, 390 (5th Cir. 2011).   The rule does not

establish how much notice must be given, but it is clear that the time must be of such

duration that the certification can be vetted for objection or impeachment in advance.   *Id.;*

*United States v. Brown,* 553 F.3d 768, 793 (5th Cir. 2008).   What notice is sufficient is

within the trial court's discretion.   *See Olguin,* 643 F.3d at 390-91.   Notice of intent to

introduce records through Rule 902(11), which notice was first provided during trial has

been found insufficient.   *Brown,* 553 F.3d at 793.   Notice provided five days in advance

of trial, where the records were produced months before trial, has been found to constitute

sufficient notice.   *Olguin,* 643 F.3d at 390-91.

In this case, if no stipulation occurs between the parties, the government intends to

introduce, through law enforcement witnesses, several types of business records, including

financial records, travel records, and medical records.   These records are accompanied by a certification that complies with the requirements of Rule 902(11).   Furthermore, notice of the government's intent to offer these records without a records custodian or qualified witness will be filed at or around the time of the government's other pretrial materials. Should the government obtain additional certifications, it will supplement its notice accordingly.

Other business records, such as those maintained by the defendant's businesses themselves, will be admitted after the foundation is laid by former employees who maintained those documents.   For example, referral binders and spreadsheets from Apple, which tracked the number of patient referrals brought in by all employees – including Veasey – will be sponsored by those employees whose job it was to maintain those documents in the normal course of Apple's business.   A former employee who understands how Apple maintained their records is well-qualified to lay the business records predicate.   *See United States v. Johnston,* 127 F.3d 380, 389-390 (5th Cir. 1997) (business records from defendant's company were properly admitted when former employees testified to their purpose and how they were maintained); *see also United States v. Fernandez,* 553 Fed.Appx. 927, 933 (11th Cir. Feb. 3, 2014) (director of nursing for defendant's home health care agency was qualified to sponsor business records made at that agency when she had first-hand knowledge of how the records were made and maintained).

### b.   Hearsay Within Hearsay

Hearsay within hearsay "is not excluded by the rule if each part of the combined statements conforms with an exception to the rule."   FED. R. EVID. 805.   This may prove relevant to the government's case because of the vast amount of medical records and associated documentation that the government will seek to admit throughout the course of the trial.   Medical records are kept in the regular course of business of any physician, and therefore admissible under Rule 803(6).   The statements contained within medical records – such as reports of current symptoms and physician's orders for current or anticipated medical treatment – are also covered under Rule 803(4), which holds admissible those statements made for medical diagnosis or treatment, or those that describe medical history, past or present symptoms, their inception, and their general cause.   To the extent that the defense may argue that any part of the information on these forms are not statements made for the purpose of medical treatment or diagnosis, the government notes that a statement that falls under this exception need only be "reasonably pertinent" to diagnosis or treatment.   FED. R. EVID. 803(4); *United States v. Santos,* 589 F.3d 759, 763 (5th Cir. 1999).

### 3.   Leading Questions

The Federal Rules of Evidence permit leading questions on direct when it is "necessary to develop the witness's testimony."   FED. R. EVID. 611(c); *United States v. Cisneros-Gutierrez,* 517 F.3d 751, 762 (5th Cir. 2008).   The government believes that leading questions would be effective in order to discuss background information and move

from topic to topic.   Further, it would be appropriate to allow leading questions on direct

in order to develop coherent testimony or lay a foundation for a line of questioning.

*United States v. Mulinelli-Navas,* 111 F.3d 983, 990 (1st Cir. 1997).

Leading questions can also be appropriate in situations where the question posed

comes after repeated attempts to elicit the same information through non-leading

questions.   For example, in *United States v. Carboni,* a Second Circuit case, the

government questioned a witness at length about meetings he had with the defendant.   204

F.3d 39, 45 (2nd Cir. 2000).   The prosecutor repeatedly asked what type of meetings the

witness had with the defendant and what was discussed.   *Id.*   The witness spoke at length

about production discussions, but never brought up the impact certain information would

have on his business.   *Id.*   As a result, the prosecutor asked a leading question to prompt

the witness to discuss what, if anything, was said regarding that topic.   *Id.*   The Court did

not abuse its discretion is allowing such questions.   *Id.*

Ultimately, controlling leading questions is within the discretion of the trial court.

*United States v. Cooper,* 606 F.2d 96, 98 (5th Cir. 1979).   The government has no

intention of asking questions that supply a witness with a "false memory."   *Id.*   However,

the government requests that the Court provide it with some latitude in asking if witnesses

remember certain topics or incidents and, if they do, allowing the witness to expound upon

what they remember.

**B.      Real Evidence**

The government's case-in-chief will feature approximately 500 exhibits, which were obtained from multiple legal sources, including government witnesses.    All of the documents the government intends to submit are authentic, and records custodians will be available to testify as such if stipulations to authenticity cannot be formalized.

1.      Authentication

According to the Federal Rules of Evidence, sufficient authentication requires only that the proponent "produce evidence sufficient to support a finding that the item is what the proponent claims it is."   FED. R. EVID. 901(a).   The government intends to introduce evidence obtained from the defendants' businesses and homes pursuant to valid search warrants.   In order to be admissible, it is the government's position that it need only be identified as an item seized from a defendant in order to be sufficiently authenticated. FED. R. EVID. 901(b) (authentication by testimony that an item is what it is claimed to be).

Understandably, the value of the items as evidence may be lessened if a witness cannot explain with sufficient knowledge the purpose of the item, who created it, or whether the document constitutes hearsay or falls within an established exception. However, the basic rule of authentication should be satisfied simply by a law enforcement agent testifying with knowledge that an item was seized from a particular location. *United States v. Wake,* 948 F.2d 1422, 1434-1435 (5th Cir. 1991) (government's use of agent testimony to authenticate items and the circumstances under which they were seized

was sufficient to authenticate evidence). Once a preliminary showing of authenticity is made, it is for the jury to decide what weight to give the evidence. *Id.*

### a. Authentication of Handwriting

The bulk of the government's evidence at trial will be documents, including the patient files, financial records, travel records, and other business records referenced above; however, many of these documents include handwritten notes and signatures. The government expects to have individuals who worked for and with the defendants, who are all independently familiar with their handwriting, to verify whether it is indeed their handwriting. Such authentication is permissible pursuant to FED. R. EVID. 901(b)(2); *United States v. Aguirre,* 155 Fed.Appx. 145, 149 (5th Cir. Nov. 18, 2005) (defendant's employees properly authenticated defendant's handwriting based on prior knowledge and working relationship with the defendant).

### b. Authentication of Audio Recordings (and Admission of Transcripts Thereof)

To sufficiently authenticate voices on an audio recording, a witness may identify a voice based upon hearing that voice at any time under circumstances connecting it with the alleged speaker. FED. R. EVID. 901(b)(5); *see also United States v. Lampton,* 158 F.3d 251, 259 (5th Cir. 1998). The rule requires only that the witness have "some familiarity" with the voice identified, and that given such familiarity, any argument of authenticity goes to the weight of the evidence, not its admissibility. *Id.*

To establish authenticity of recordings, the government must demonstrate: (1) the operator's competency; (2) fidelity of recording equipment; (3) absence of material deletions, additions, or alterations; and (4) identification of relevant speakers.   *United States v. Stone,* 960 F.2d 426, 436 (5th Cir. 1992).   However, this list does not command "formalistic adherence."   The admissibility of such evidence is within the discretion of the trial court, and such evidence may be admitted if, upon independent examination, the trial court is convinced that the recording accurately reproduces the auditory experience. *Id.*; *see also United States v. Buchanan,* 70 F.3d 818, 827 (5th Cir. 1995).

J.A. is expected to testify to the authenticity of the recorded conversations he had with Dr. Roy regarding patient recruitment.   Having worked for Dr. Roy for many years and personally taken part in the phone calls in question, J.A. can also identify Dr. Roy's voice and discuss the circumstances surrounding the call.   J.A. can also discuss how these audio clips were recorded and whether he made deletions or alterations, thereby satisfying the four requirements listed above.

The government also intends to introduce transcripts of these recordings.   Whether a jury should be presented with transcripts is a matter left to the discretion of the trial court.   *United States v. Onori*, 535 F.2d 938, 947 (5th Cir. 1976).   The Fifth Circuit has held that "transcripts are sometimes useful for helping juries understand evidence of taped conversations."   *United States v. Rena,* 981 F.2d 765, 768 (5th Cir. 1993). Transcripts, like other evidence, may be admitted for a limited purpose – as evidence to

aid the jury in understanding the recording by identifying speakers.    *Onori,* 535 F.2d at 947.

The Fifth Circuit has established guidelines for the use of transcripts at trial, outlining a "preferred procedure," under which the parties agree and stipulate to a transcript to be given to the jury.    *Stone*, 960 F.2d 426, 436 (5th Cir. 1992).    If the parties cannot agree on an accurate transcript, then either a single transcript containing each parties' version of the disputed portions of the recording or two transcripts (one from each party) may be submitted to the jury.    *See id.* at 436-37.    The trial court should allow the parties an opportunity "to present additional evidence supporting the accuracy of its version" of the transcript.    *Onori*, 535 F.2d at 949.    The jury would then exercise its traditional fact-finding role and determine which version of the disputed transcripts is correct.    *See id.* at 948.

As with all evidence it intends to introduce at trial, the government will seek a stipulation from the defense as to the transcripts of J.A.'s recordings.    If the parties cannot stipulate, the parties will follow the procedure outlined above.    Here, given the anticipated length of the trial and the importance of the recordings, which show that Dr. Roy was aware of Stiger and Veasey's improper recruiting and was therefore a knowing participant in the scheme to defraud, the government respectfully requests that the Court allow admission of these transcripts.

### c.    Video and Photographic Surveillance

The government also expects to introduce video surveillance, as well as still photographs, of certain beneficiaries to support the government's contention that they were not homebound.    In order to authenticate such evidence, the government need only provide a witness who can identify the individual in question from prior knowledge. *See generally United States v. Castillo-Chavez,* 555 Fed.Appx. 389, 395 (5th Cir. Feb 14, 2014) (gas station surveillance video sufficiently authenticated by co-conspirator familiar with the individuals identified on the tape and the gas station in question).    In this case, law enforcement agents who interviewed the beneficiaries in question will authenticate these videos, as well as any related photographs.

## C.    Summary Exhibits and Witnesses

### 1.    Summary Exhibits

As part of its case-in-chief, the government intends to offer a number of summary exhibits.   Federal Rule of Evidence 1006 provides:

> A proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court.   The proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place. The court may order the proponent to produce them in court.

FED. R. EVID. 1006.   Rule 1006 "allows for the admission of summaries when (1) the evidence previously admitted is voluminous and (2) review by the jury would be inconvenient."   *United States v. Bishop,* 264 F.3d 535, 547 (5th Cir. 2001).   "Summary evidence must have an adequate foundation in evidence that is already admitted, and

should be accompanied by a cautionary jury instruction." *Id.*   In order to minimize the

risk of prejudice from such evidence, the defense must be afforded the full opportunity to

cross-examine the sponsoring witness.   *See id.*

In the instant case, the government intends to offer a number of summary charts that

fall within the scope of Rule 1006.   First, the government intends to offer Exhibits

221-223 and Exhibit 402, which summarize voluminous Medicare manuals.[9]   The

government's program witnesses, Mark Porter and Lisa Garcia, will testify that the

substance of these charts – including the different parts of Medicare, Medicare's

requirements for home health care services (including that a patient be under the care of a

physician, homebound, and in need of skilled nursing services), and the process by which a

beneficiary legitimately receives home health care – are laid out in these manuals.   The

manuals number hundreds of pages and include material that is not specifically relevant to

the offenses charged in the instant case; conversely, the summary charts are the manuals

synthesized into the basics of Medicare coverage and the requirements for home health

care.   These manuals are available electronically to the public and have been available for

inspection by the defense for several months; further, Mr. Porter and Ms. Garcia will be

subject to cross-examination.   As the manuals are voluminous, but will be admitted in

evidence, the requirements of Rule 1006 have been met and these exhibits should be

admissible as summary exhibits.

---

9  The manuals themselves will be offered as Exhibits 225-239 and 399.   These charts are derived primarily from Exhibits 225, the Medicare Benefit Policy Manual, and Exhibit 399, "Medicare and You."

Second, the government intends to offer a number of summary charts prepared by Melissa Parks, a certified fraud examiner, found at Exhibits 357-370 and 449-476, which are derived from evidence that has been readily available to the defense, either by specific production or for review, for years (and, in many cases, since the time of the original indictment in February 2012).

The government intends to offer much of the evidence used to compile these charts prior to introducing the charts themselves.   Each summary chart will include the specific exhibits that provide the basis for the information illustrated in the chart. A table of that information is included below:

| Exhibit | Title | Supporting Exhibit(s) |
|---|---|---|
| 449 | Keeping Apple Afloat | 406, 410, 414, 424, 425 |
| 450 | Significant Payees from Apple of Your Eye Bank Accounts | 413-432 |
| 451 | Apple of Your Eye Cash Withdrawals By Year | 413-424, 428, 430-432 |
| 452 | Cynthia Stiger Profits | 413-423, 436, 437 |
| 453 | Wilbert Veasey Profits | 413-423, 432-434 |
| 454 | Donations to Churches Out of Apple and Wilbert Veasey Accounts | 414, 416, 436-437 |
| 455 | Apple of Your Eye Signature Analysis | 413-424, 431 |
| 456 | Examples of Personal Expenses Paid Out of Charry Accounts | 439 |
| 457 | Jacques Roy Profits | 405-408, 440, 441 |
| 458 | Medistat Deposit Analysis (January 2006 through August 2011) | 405-408 |
| 459 | Charry Home Care Services, Inc. Deposits Analysis (May 2007 through March 2011) | 439 |

| 460 | Medcare Housecalls Deposit Analysis (June 2011 through September 2012) | 411, 412 |
|---|---|---|
| 461 | Apple of Your Eye Deposits Analysis (January 2006 through August 2011) | 413-462 |
| 462 | Charry Home Care Services Medicare Claims Medistat vs Non Medistat Physicians (June 2010 – June 2011) | 413-432 |
| 463 | Apple of Your Eye, Inc. Medicare Claims Submission Medistat vs Non Medistat (April 2006 through July 2011) | 347 |
| 464 | Ultimate Medicare Claims Submission Medistat Physicians vs Non Medistat (January 2006 – December 2010) | 348 |
| 465 | Medcare: Medicare Claims Billing Analysis By Year | 349 |
| 466 | Medcare Claims Analysis Comparison Between May and June 2011 | 349 |
| 467 | Percent to Total Analysis of Charry Data | 345, 347, 351 |
| 468 | Apple of Your Eye, Inc. Longest Consecutive Medistat Beneficiaries on Home Health | 345, 346 |
| 469 | Dr. Roy Patient Per Day Analysis Medistat Part B Billing January 2006 through August 2011 | 345 |
| 470 | Dr. Roy # of G Codes Billed on Christmas Day | 345 |
| 471 | Dr. Roy Medicare Claims Submission During Certain Dates He Was Out of the Country | 345, 348 |
| 472 | # of Days Per Month a G Code Bill was Generated to Medicare Under Dr. Roy | 345 |
| 473 | Dr. Roy Top 25 Days for G Code Billing | 345 |
| 474 | Medistat Claims Analysis on Select Procedure Codes Average Allowed by Year | 345 |
| 475 | Apple Cash Calendar | 414, 415, 417, 419, 420, 422, 423 |

| 476 | Medistat 485 Review | 492[10] |

Finally, Ms. Parks fully expects to be subject to cross-examination.

As to whether the evidence used to prepare the charts is "voluminous," and whether review by the jury would be inconvenient, as the indictment alleges, Dr. Roy maintained a patient roster of over 11,000 unique patients, who received services from 500 home health companies.   The claims data for these companies, as well as the indicted companies, which is maintained by CMS, is housed in a unique computer system that makes the data difficult to interpret without significant assistance.   Moreover, the financial records used to support these charts are from approximately 41 separate bank accounts covering an eight-year period and are far too cumbersome to individually review with the jury.[11]

Therefore, the government urges the Court to permit the use of these summary charts.

2.   <u>Summary Witnesses</u>

Federal Rule of Evidence 1006 "does not specifically address summary witnesses or summarization of trial testimony."   *United States v. Nguyen,* 504 F.3d 561, 572 (5th Cir. 2007), *quoting United States v. Fullwood,* 342 F.3d 409, 413 (5th Cir. 2003).   However, summary witness testimony is permitted in "limited circumstances in complex cases,"

---

10 Exhibit 492 is POCs pulled from Medistat's electronic files.   However, Exhibit 476 is based on data compiled from ALL POCs from Medistat, as well as POCs from Apple.   The government concedes that all of the POCs used to complete Exhibit 476 will not be admitted through Exhibit 492, but would ask that the Court consider this specific chart a demonstrative aid within the scope of Rule 611(a).   *See United States v. Taylor,* 210 F.3d 311, 315 (5th Cir. 2000) (demonstrative aids are typically permissible to assist the jury in evaluating the evidence, provided the jury is forewarned that the charts are not independent evidence).
11 For example, Exhibit 405, which is Medistat's main financial account, contains over 46,000 pages.

though the parties should be aware of its potential danger.   *United States v. Armstrong,*

619 F.3d 380, 385 (5th Cir. 2010).   A complex case is one that includes "numerous

witnesses, technical testimony, and scores of exhibits."   *Id.*   When permitting a summary

witness, the Court should be mindful that the summary testimony "[has] an adequate

foundation in evidence that is already admitted, and should be accompanied by a

cautionary jury instruction."   *Id.*   That instruction should be similar to that approved in

*United States v. Lavergne,* stating that "witness summaries do not, of themselves,

constitute evidence in the case but only purport to summarize the documented and detailed

evidence already submitted."   805 F.2d 517, 522 (5th Cir. 1986), *quoting United States v.*

*Diez,* 515 F.2d 892, 905 (5th Cir. 1975).   The Court should also permit a full scope of

cross-examination by the defense.   *Id.*

The Government intends to call Special Agent Miranda Bennett[12] as its final

witness in its case in chief.   Special Agent Bennett will serve as both a summary witness

and a fact witness, in that she will testify to her overall investigation as well as accurately

synthesize the evidence already submitted at trial.   This case clearly qualifies as complex,

not only because of its designation as such by this Court and the amount of time allotted to

the defense to prepare for trial, but because the government expects to call approximately

70 witnesses and present more than 500 exhibits to prove its case over a three-to-four week

period.   The government therefore believes that, with the appropriate cautionary

---

12 Special Agent Bennett works for the Department of Health and Human Services Office of Inspector
General (HHS-OIG) and will be one of the case agents seated at the government's counsel table throughout
trial.

**U.S. v. Jacques Roy, M.D. et al**
**Government's Trial Brief - Page 30**

instruction, Special Agent Bennett's summary testimony would be admissible.   *See Armstrong,* 619 F.3d at 385-386 (district court did not abuse its discretion in allowing summary testimony where the case was complex, testimony did not go beyond summarizing the evidence already in the record, and witness was subject to extensive cross-examination).

**D.     Excusing Multiple Case Agents from "The Rule"**

Under Rule 615, should a party request it, the Court must exclude witnesses so that they cannot hear other witnesses' testimony.   The government respectfully requests that, should the defense invoke this rule, the Court exclude FBI Special Agent Chelsie Drews and HHS-OIG Special Agent Bennett from its provisions.   As the Court and parties are aware, this case was investigated jointly by both agents and, while both are expected to testify regarding their investigation, the government will request that both be seated at the government's counsel table throughout trial.

Rule 615 contains exceptions that permit the Court to allow both case agents to remain in Court throughout the duration of the trial.   Those exceptions include those individuals who are employees of parties that are not natural persons, after being designated as that party's representative, as well as individuals whose presence a party shows to be essential to presenting the party's claim or defense.   FED. R. EVID. 615(b), (c).

The decision as to how many agents may be excused from sequestration is within the discretion of the Court.   *United States v. Alvarado,* 647 F.2d 537, 540 (5th Cir. 1981).

The Fifth Circuit has not definitively held whether one or more case agents may be exempted solely because they are designated as representatives of a party, pursuant to Rule 615(b).   *See generally United States v. Payan,* 992 F.2d 1387, 1394 (5th Cir. 1997).   The government believes that, as they represent two separate and distinct agencies, both agents should be exempted from sequestration pursuant to this exception.

Regardless, the government believes the third exception applies, as both agents are essential to the presentation of the government's case.   FED. R. EVID. 615(c).   The government need not belabor the breadth and scope of the investigation undertaken by these agents or the complexity of the case the government intends to present.   Both agents have interviewed hundreds of witnesses and reviewed thousands of documents during the last five years, and the moving parts orchestrated jointly by each agent clearly demonstrates that they will be essential to the government throughout trial.[13]   Further, Special Agent Drews is expected to testify relatively early in the trial to facilitate the admission of a significant amount of evidence, which minimizes any risk of prejudice in keeping both agents in the courtroom throughout trial.   As a result, the government requests that both be excluded from sequestration.

---

13 In fact, as the Court may remember, the presence of its agents at trial was a primary concern in the government's passionate opposition to the defense's last motion for a continuance.

**U.S. v. Jacques Roy, M.D. et al**
**Government's Trial Brief - Page 32**

Respectfully submitted,

JOHN R. PARKER
UNITED STATES ATTORNEY


/s/ *P.J. Meitl*
P.J. MEITL
Assistant United States Attorney
District of Columbia Bar No. 502391
Virginia Bar No. 73215
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone: (214) 659-8680
Facsimile: (214) 659-8812
Email: philip.meitl@usdoj.gov

/s/ *Nicole Dana*
NICOLE DANA
Special Assistant United States Attorney
Texas State Bar No. 24062268
1100 Commerce Street, Third Floor
Dallas, Texas   75242-1699
Telephone: 214-659-8694
Facsimile: 214-659-8805
Email: nicole.dana@usdoj.gov


/s/ *Chad E. Meacham*
CHAD E. MEACHAM
Assistant United States Attorney
Texas State Bar No. 00784584
1100 Commerce Street, Third Floor
Dallas, Texas   75242-1699
Telephone: 214-659-8716
Facsimile: 214-659-8727
Email: chad.meacham@usdoj.gov

## CERTIFICATE OF SERVICE

On February 17, 2016, I electronically submitted the following document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court.   I hereby certify that I have served all counsel and/or pro se parties of record electronically or by another manner authorized by Federal Rule of Criminal Procedure 49(b).

s/ *Nicole Dana*
Nicole Dana
Special Assistant United States Attorney